|   |   |
|---|---|
| JUAN MIRANDA CHAVEZ,              ) | Case No.: 1:15-cv-01853 - JLT |
|       Plaintiff,                  ) | ORDER REMANDING THE ACTION PURSUANT TO SENTENCE FOUR OF 42 U.S.C. § 405(g) |
|       v.                          ) | |
| NANCY A. BERRYHILL[1],             ) | ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF PLAINTIFF JUAN CHAVEZ AND AGAINST DEFENDANT NANCY BERRYHILL, ACTING COMMISSIONER OF SOCIAL SECURITY |
| Acting Commissioner of Social Security, ) | |
|       Defendant.                  ) | |

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

Juan Miranda Chavez asserts he is entitled to disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act. Plaintiff argues the administrative law judge erred in evaluating the record and seeks judicial review of the decision to deny his application for benefits. Because the ALJ failed to identify legally sufficient reasons for rejecting the opinion of Plaintiff's treating physician and the consultative examiner, the decision is **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings.

## PROCEDURAL HISTORY

Plaintiff filed his applications for benefits on March 20, 2012, alleging disability beginning on January 11, 2011. (Doc. 9-3 at 19) The Social Security Administration denied Plaintiff's application at

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill is substituted for her predecessor, Carolyn W. Colvin, as the defendant.

both the initial level and upon reconsideration.  (*See generally* Doc. 9-4)  After requesting a hearing, Plaintiff testified before an ALJ on March 3, 2014.  (Doc. 7-3 at 14, 49)  The ALJ determined Plaintiff was not disabled and issued an order denying benefits on April 16, 2014.  (*Id.* at 13-25)  When the Appeals Council denied Plaintiff's request for review on October 15, 2015 (*id.* at 4-6), the ALJ's findings became the final decision of the Commissioner of Social Security ("Commissioner").

## STANDARD OF REVIEW

District courts have a limited scope of judicial review for disability claims after a decision by the Commissioner to deny benefits under the Social Security Act. When reviewing findings of fact, such as whether a claimant was disabled, the Court must determine whether the Commissioner's decision is supported by substantial evidence or is based on legal error. 42 U.S.C. § 405(g).  The ALJ's determination that the claimant is not disabled must be upheld by the Court if the proper legal standards were applied and the findings are supported by substantial evidence.  *See Sanchez v. Sec'y of Health & Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)).  The record as a whole must be considered, because "[t]he court must consider both evidence that supports and evidence that detracts from the ALJ's conclusion."  *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

## DISABILITY BENEFITS

To qualify for benefits under the Social Security Act, Plaintiff must establish he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. § 1382c(a)(3)(A).  An individual shall be considered to have a disability only if:

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).  The burden of proof is on a claimant to establish disability.  *Terry v.*

*Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990). If a claimant establishes a prima facie case of disability, the burden shifts to the Commissioner to prove the claimant is able to engage in other substantial gainful employment. *Maounois v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

## ADMINISTRATIVE DETERMINATION

To achieve uniform decisions, the Commissioner established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 404.1520, 416.920(a)-(f). The process requires the ALJ to determine whether Plaintiff (1) engaged in substantial gainful activity during the period of alleged disability, (2) had medically determinable severe impairments (3) that met or equaled one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4) had the residual functional capacity ("RFC") to perform to past relevant work or (5) the ability to perform other work existing in significant numbers at the state and national level. *Id.* The ALJ must consider testimonial and objective medical evidence. 20 C.F.R. §§ 404.1527, 416.927.

A.   **Relevant Medical Evidence**

Plaintiff was diagnosed with type II diabetes mellitus and hypertension prior to 2000. (Doc. 9-9 at 26) In addition, Plaintiff was in a car "accident in 1989, which resulted in a back injury" that required "multiple spinal surgeries in Mexico." (*Id.*)

In 2000, Plaintiff had "a chronic infection of his left hip," which was "the result of a prior infection in his lower lumbar spine… after an [operation] in Mexico." (Doc. 9-9 at 55) The infection "tracked down the iliopsoas, creating an iliopsoas abscess, which subsequently went into the hip." (*Id.*) Plaintiff was diagnosed with chronic septic arthritis, osteomyelitius, and ankylosis in his left hip. (*Id.* at 54) He had surgery "for resection of his hip and insertion of a methyl methacrylate antibiotic spacer" on May 18, 2000. (*Id.* at 55) In the fall of 2000, Plaintiff "had significant pain for 2-3 weeks." (*Id.* at 23) Although "settling" of the articulated spacer was suspected, surgery revealed Plaintiff had "a periprosthetic fracture." (*Id.*) Therefore, Plaintiff was admitted to the hospital "for reimplantation surgery of his total hip arthroplasty." (*Id.*)

In April 2011, Plaintiff visited the Joy Kimpo Medical Center ("Kimpo Center") for a follow-up on his diabetes. (Doc. 9-8 at 17) Marylou Ayon, MA, believed that Plaintiff's diabetes was "well controlled with diet, exercise and weight management and oral medication." (*Id.*)

Plaintiff returned to the Kimpo Center in May 2011, describing "generalized hip pain," which he said was a constant, "mild to moderate" pain and rated "as a six on a 1 to 10 scale." (Doc. 9-8 at 21) Dr. Paramjit Panesar determined Plaintiff had "mild tenderness" in his left hip. (*Id.*) Dr. Panesar also found Plaintiff had limited internal rotation, external rotation, and flexion. (*Id.*)

In October 2011, Plaintiff continued to report hip pain at the Kimpo Center, stating he could not "bend to do chores." (Doc. 9-8 at 33) He told Dr. Juan Cabrera that he had an appointment with an orthopedist at Kern Medical Center set "next year." (*Id.*) Dr. Cabrera did not see any bruising, rash, or eruptions on Plaintiff's skin. (*Id.*)

In November 2011, Dr. Panesar determined that Plaintiff's diabetes was "well controlled with diet, exercise and weight management and oral medication." (Doc. 9-8 at 35) He did not find any "[o]ther manifestations of his diabetes," such as pedal edema or ulcerations. (*Id.* at 35-36)

On January 25, 2012, Plaintiff went to Kern Medical Center, and described "stiffness and discomfort and pain that extend[ed] from his left hip to his left thigh." (Doc. 9-8 at 6) Plaintiff said he did not have night pain, fevers, chills, or recent trauma. (*Id.*) Dr. Arturo Gomez observed that Plaintiff walked with a "[s]tiff limping gait." (*Id.* at 7) Upon examination, Plaintiff had "full range of motion" with his right leg, but the motion with his left hip was "significantly limited." (*Id.*) Dr. Gomez opined Plaintiff did "not appear to have any range of motion at the hip joint." (*Id.*) After reviewing x-ray findings, Dr. Gomez informed Plaintiff they did not have anyone at Kern Medical Center with "the skill set to manage this kind of condition," and he recommended that Plaintiff "see… somebody who is fellowship trained in total joints to help." (*Id.*)

In April 2012, Plaintiff "continue[d] to have low back pain and [was] unable to bend and lift things." (Doc. 9-8 at 86, emphasis omitted) In addition, Dr. Cabrera observed that Plaintiff continued to walk with a limp. (*Id.*) Dr. Cabrera completed a supplementary certificate for the Employment Development Department, in which he indicated Plaintiff had been diagnosed with "pelvic joint pain" and was "unable to lift things [secondary] to pain." (*Id.* at 88, 98) In addition, Dr. Cabrera indicated Plaintiff was expected to remain disabled until May 31, 2012. (*Id.* at 86, 88, 98)

Dr. Juliane Tran performed a comprehensive orthopedic evaluation on June 22, 2012. (Doc. 9-8 at 48) Plaintiff reported his hip surgery provided "75% of pain relief," but the pain returned and "got

worse by 2010." (*Id.*)  He said it was "a shooting, throbbing pain" that was a "5" to 8" out of 10. (*Id.*) In addition, Plaintiff described "occasional symptoms of paraesthesia in the left foot and left ankle." (*Id.*)  Dr. Tran observed that Plaintiff was able to "ambulate[] to the exam room without an assistive device," though he walked with a slow pace and "mild moderately antalgic" gait. (*Id.* at 49)  Dr. Tran found Plaintiff's left hip flexion and internal rotation were limited. (*Id.*)  Plaintiff had a "very positive" FABER test result in the left hip, and "mildly positive" test in the right hip. (*Id.* at 50)  Dr. Tran found Plaintiff's grasping strength was "5/5" and motor strength was "5/5… throughout the deltoids, biceps, triceps, wrist extensors, first dorsal interosseous muscles, abductor pollicis brevis, and abductor digiti minimi." (*Id.*)  She also determined Plaintiff had "some abnormal sensation in the distal feet," and opined Plaintiff had "[p]ossible peripheral neuropathy." (*Id.* at 51)  Dr. Tran concluded Plaintiff would "need to have an assistive device to ambulate in the community," and "even with an assistive device he probably should not ambulate more than four hours a day." (*Id.*)  Further, she believed Plaintiff had "restriction with all climbing, balancing and working with heights;" was limited to "frequent negotiating of steps, stairs and uneven terrain;" and should do no more than "frequent bending, stooping, kneeling, and crouching." (*Id.*)  Dr. Tran opined Plaintiff did not have restrictions with fingering or grasping, but should be limited to lifting "no more than 10 pounds." (*Id.*)

Dr. J. Frankel reviewed the record and completed a physical residual functional capacity assessment on July 6, 2012.  (Doc. 9-4 at 7-12)  Dr. Frankel observed that Plaintiff had a total hip arthroplasty, diabetes, and hypertension. (*Id.* at 8)  According to Dr. Frankel, Plaintiff was limited to lifting and carrying 10 pounds frequently and 20 pounds occasionally; and was limited with pushing and pulling with his left leg. (*Id.* at 8-9)  Dr. Frankel believed Plaintiff could occasionally climb ramps and stairs, kneel, stoop, crouch, and crawl; but never climb ladders, ropes and scaffolds. (*Id.*)  Further, Dr. Frankel opined Plaintiff could stand or walk for "2 hours" in an 8-hour day and sit "about 6 hours in an 8-hour day." (*Id.*)  Dr. Frankel believed Plaintiff needed to "[a]void even moderate exposure" to environmental hazards such as machinery and heights. (*Id.* at 10)  Dr. Frankel concluded a restriction to sedentary work was appropriate. (*Id.* at 11)

In September 2012, Plaintiff reported he was "not checking blood sugars at home" because his Glucometer broke. (Doc. 9-8 at 78)  Mary Maun Viduya, PA-C, found Plaintiff did not have any

sensory loss, and there was no evidence of edema in his extremities. (*Id.* at 80) She gave Plaintiff information on the importance of diet, weight loss, and regular exercise. (*Id.*)

In December 2012, Dr. Cabrera noted that Plaintiff was complaint with his medication, but his glucose was elevated. (Doc. 9-8 at 56) Dr. Cabrera observed that Plaintiff did not have gait disturbance and found Plaintiff had normal "muscle strength, and stability in all extremities with no pain on inspection." (*Id.* at 57-58) Dr. Cabrera found Plaintiff did not have any sensory loss. (*Id.* at 58) He recommended Plaintiff start Lantus, which Plaintiff refused at that time, choosing to continue with his medication with the addition of Onglyza, for which he received samples. (*Id.*)

Dr. G. Bugg reviewed the record on January 2, 2013, and indicated he "adopted as written" the sedentary work imposed by Dr. Frankel. (Doc. 9-4 at 30)

Dr. Cabrera again found that Plaintiff's glucose was elevated in January 2013. (Doc. 9-10 at 52) Plaintiff reported he had a fungus eroding "thru his nail then to the toe itself." (*Id.*, emphasis omitted) Dr. Cabrera observed that Plaintiff had "toe onychomycosis with black discoloration at the tip of [his] toe with surrounding erythema. (*Id.* at 55, emphasis omitted) He found Plaintiff's pedis pulses were normal, and he did not have sensory loss. (*Id.*) Dr. Cabrera noted he would send Plaintiff to an emergency room for evaluation and possible evaluation, and to be seen by a surgeon/podiatrist. (*Id.*)

Plaintiff did not go to the emergency room as Dr. Cabrera, and instead "[t]reated the foot with daily dressings and topical antibiotics." (Doc. 9-10 at 47, emphasis omitted) In February 2013, Plaintiff reported he no longer had pain, and Dr. Cabrera found the necrotic area was improved. (*Id.*)

In March 2013, Dr. Ronald Marmolejo, a podiatrist, began treating Plaintiff. (Doc. 9-9 at 83) He noted Plaintiff "complain[ed] of painful left 2nd and 3rd toes on the left foot and a painful left hallux due to the bunion deformity of the left foot." (*Id.*) Dr. Marmolejo noted that while Plaintiff had a history of ulcers and infections, he did not have any at that time. (*Id.*) However, Dr. Marmolejo determined Plaintiff had "[d]iminished pedal pulses." (*Id.*) Dr. Marmolejo diagnosed Plaintiff with hammertoe deformities, and discussed "the possible risk of progression and worsening." (*Id.*) He instructed Plaintiff to continue with all his medications as per Dr. Cabrera's instructions. (*Id.*)

In June 2013, Dr. Cabrera noted Plaintiff was compliant with his medication, and taking both Clucophage and Clipizide as directed. (Doc. 9-10 at 34) Plaintiff had a follow-up appointment with

Dr. Marmolejo, and reported his pain was a "6/10." (Doc. 9-9 at 82) Dr. Marmolejo observed that Plaintiff had "an ulcer starting on the left 2nd toe," erythemia and edema. (*Id.*) Dr. Marmolejo gave Plaintiff a Silipos toe cap to protect the toe "and help with any pressure or possible trauma." (*Id.*) In addition, he gave Plaintiff samples of Bactrim DS. (*Id.*) At a follow-up appointment a week later, there was "a decrease in swelling and pain," which Plaintiff described as "2/10." (*Id.*) Dr. Marmolejo found Plaintiff continued to have "[d]iminished pedal pulses." (*Id.* at 81, 82)

Plaintiff reported he was feeling a little better and his glucose level was "improving with [the] current regimen" in July 2013. (Doc. 9-10 at 23) Plaintiff told Dr. Cabrera that his pain was "0/10," and Dr. Cabrera noted that Plaintiff had "[n]ormal range of motion, muscle strength, and stability in all extremities with no pain on inspection." (*Id.* at 25-26) Plaintiff had lab tests done, and returned two weeks later to Dr. Cabrera. (*Id.* at 22, 26) Dr. Cabrera found Plaintiff's HGA1C level was at 9.0, and increased Plaintiff's prescription for Lantus, which improved Plaintiff's glucose level. (*Id.* at 22, 13)

Plaintiff had a new ulcer on his right foot in October 2013. (Doc. 9-9 at 79) Dr. Marmolejo noted that Plaintiff reported frequent muscle/tendon pain, loss of balance, and described his pain as "4/10". (*Id.*) He observed Plaintiff had erthema and edema on his right foot, as well as pain on palpation. (*Id.*) Dr. Marmolejo "[a]pplied a topical anesthetic" to debride the ulcer, and instructed prescribed medication to Plaintiff. (*Id.*) He instructed Plaintiff "to limit his weight bearing and only ambulate for necessities," as well as "rest and elevate the right lower extremity." (*Id.* at 80) At a follow-up appointment a week later, Plaintiff continued to have erythema, edema, and diminished pedal pulses. (*Id.* at 77) Dr. Marmolejo again told Plaintiff "to continue to limit his weight bearing," rest, elevate his foot, and "only ambulate for necessities." (*Id.*)

In January 2014, Plaintiff's diabetes mellitus was uncontrolled. (Doc. 9-10 at 5) He received counseling regarding diet, exercising "30-45 minutes 3x a week," and weight reduction. (*Id.* at 5-6)

Dr. Cabrera completed a "Residual Functional Capacity Questionnaire" on March 11, 2014. (Doc. 9-10 at 57-58) He opined Plaintiff could rarely lift up to 10 pounds, and never more than 10 pounds. (*Id.* at 57) Dr. Cabrera indicated that Plaintiff's manual and finger dexterity was estimated to be in the bottom 10% of the general population, and he could never handle, push, pull, or do fine manipulation. (*Id.*) Dr. Cabrera believed Plaintiff could rarely bend, stoop, squat, crawl, climb, reach,

crouch, or kneel. (*Id.*) He also indicated that Plaintiff required environmental limitations and needed to avoid exposure to unprotected heights; being around moving machinery; exposure to marked temperature changes; driving automotive equipment; exposure to dust, fumes, other irritants, and noise. (*Id.* at 58) According to Dr. Cabrera, Plaintiff's limitations were due to "diabetic neuropathy & ischemic foot." (*Id.*)

**B.     Administrative Hearing Testimony**

Plaintiff testified before the ALJ at a hearing on March 3, 2014. (Doc. 9-3 at 49) He reported that his work history included working as a parts manager, helping customers with their auto parts, and as heavy machinery parts manager. (*Id.* at 50) Plaintiff said he stopped working in January 2011 because he "couldn't perform [his] duties anymore." (*Id.* at 51) He said he tried to apply at different locations, such as Home Depot and Costco, but stopped looking for work "about a year and a half" before the hearing date. (*Id.*)

Plaintiff testified that his diabetes was not under control, and he had some side effects from the medication, including "a lot of itching." (Doc. 9-3 at 55) He said he needed a cane, and though he did not use one to go to the hearing, he believed he "should have." (*Id.* at 56) Plaintiff reported that gripping items, such as a jar he needed to open, was difficult because he had "a lot of tingling" in his hands, and "no strength." (*Id.*)

He estimated that he could lift "from the bottom, deadweight about two, three pounds," because he could not "bend over and pick up anything heavy." (Doc. 9-3 at 51) If sitting at a table, Plaintiff believed he could lift "about five or six pounds or so." (*Id.*) He explained lifting was limited because he "had to adjust [to] very certain different ways to lift." (*Id.* at 52) Plaintiff believed he could stand for "15, 20 minutes" at one time, walk twenty minutes at one time, and sit "10, 15 minutes." (*Id.*)

Plaintiff said that he tried to keep his living area as clean "as much as [he] can." (Doc. 9-3 at 53) He explained he was able to dust, sweep, and "vacuum for a little bit, just little areas," but did not mop because he was afraid that he would fall. (*Id.*) Plaintiff reported he could cook and "do dishes until [he] can't stand anymore." (*Id.*) He said he tried "to walk to exercise… [and] to move around but it's hard." (*Id.* at 54) He reported that he watched television some, but did not read because he had stigmatism and got "headaches looking at books." (*Id.*) Plaintiff also stated, "When I get a chance I

8

use a laptop." (*Id.*) Plaintiff testified he had to lie down each day, "three, four times a day" for "20 to 30 minutes" at a time, because he it helped his muscles relax. (*Id.* at 59)

## C. The ALJ's Findings

Pursuant to the five-step process, the ALJ determined Plaintiff did not engage in substantial gainful activity after the alleged onset date of January 11, 2011. (Doc. 9-3 at 15) At step two, the ALJ found Plaintiff's severe impairments included: "diabetes mellitus; right foot abnormalities; status post left hip replacement with ankylosing; and obesity." (*Id.*) At step three, the ALJ determined Plaintiff did not have an impairment, or combination of impairments, that met or equaled a Listing. (*Id.* at 16) Next, the ALJ determined:

> [T]he claimant has the residual functional capacity perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant can lift 20 pounds and can complete an eight-hour workday if given the option to alternate between sitting and standing, as needed up to 30 minute increments.

(*Id.* at 16) Based upon this RFC, the ALJ concluded Plaintiff was "unable to perform any past relevant work." (*Id.* at 23) However, the ALJ determined "there are jobs that exist in significant numbers in the national economy that the claimant can perform." (*Id.* at 24) Consequently, the ALJ found Plaintiff was not disabled as defined by the Social Security Act. (*Id.* at 24-25)

## DISCUSSION AND ANALYSIS

Plaintiff contends the ALJ erred in his evaluation of the medical record. (Doc. 12 at 9-16) According to Plaintiff, "[t]he ALJ failed to articulate a legally sufficient rationale" to reject the opinions of his treating physician, Dr. Cabrera, and the consultative examiner, Dr. Tran. (*Id.* at 9) On the other hand, the Commissioner contends "the ALJ properly reviewed the medical evidence to determine that Plaintiff's impairments were not disabling and that he had the residual functional capacity (RFC) to perform a limited range of light work." (Doc. 15 at 3)

## A. Evaluation of the Medical Evidence

In this circuit, the courts distinguish the opinions of three categories of physicians: (1) treating physicians; (2) examining physicians, who examine but do not treat the claimant; and (3) non-examining physicians, who neither examine nor treat the claimant. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996). In general, the opinion of a treating physician is afforded the greatest weight but it is not binding on the ultimate issue of a disability. *Id.*; *see also* 20 C.F.R. § 404.1527(d)(2); *Magallanes*

*v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989). Further, an examining physician's opinion is given more weight than the opinion of non-examining physician. *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

A physician's opinion is not binding upon the ALJ, and may be discounted whether or not another physician contradicts the opinion. *Magallanes*, 881 F.2d at 751. An ALJ may reject an *uncontradicted* opinion of a treating or examining medical professional only by identifying "clear and convincing" reasons. *Lester*, 81 F.3d at 831. In contrast, a *contradicted* opinion of a treating or examining professional may be rejected for "specific and legitimate reasons that are supported by substantial evidence in the record." *Id.*, 81 F.3d at 830. When there is conflicting medical evidence, "it is the ALJ's role to determine credibility and to resolve the conflict." *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984). The ALJ's resolution of the conflict must be upheld when there is "more than one rational interpretation of the evidence." *Id.; see also Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) ("The trier of fact and not the reviewing court must resolve conflicts in the evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ"). Because the opinions of Drs. Cabrera and Tran were contradicted by Drs. Frankel and Bugg, the ALJ was required to set forth specific and legitimate reasons to reject the opinions.

   1. Opinion of Dr. Tran

Evaluating the medical evidence, the ALJ indicated he gave "some weight to Dr. Tran's assessment." (Doc. 9-3 at 21) The ALJ explained:

> [O]verall, the medical evidence does not support such significant restrictions and her more restrictive assessments are contrary to some of the self-reported abilities and overall findings upon exam that were within normal limits. No treating physician has prescribed a cane for ambulation.

(*Id.*) Plaintiff contends these were not proper reasons for discounting portions of Dr. Tran's opinion. (Doc. 12 at 11-12)

Importantly, the Ninth Circuit determined an ALJ may give less weight to the opinion of a physician when an ALJ finds inconsistencies with the physician's records, *and* the ALJ explains why the opinion "did not mesh with [his] objective data or history." *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008). Similarly, inconsistency with the overall record constitutes a legitimate reason

for discounting a physician's opinion. *Morgan v. Comm'r of the SSA*, 169 F.3d 595, 602-03 (9th Cir. 1999). However, to reject an opinion as inconsistent with the physian's notes or medical record, the "ALJ must do more than offer his conclusions." *Embrey v. Bowen*, 849 F.2d 418, 421 (9th Cir. 1988). The Ninth Circuit explained: "To say that medical opinions are not supported by sufficient objective findings or are contrary to the preponderant conclusions mandated by the objective findings does not achieve the level of specificity our prior cases have required." *Id.*, 849 F.2d at 421-22.

Here, the ALJ failed to identify specific evidence in the record that is inconsistent with the findings of Dr. Tran, or to explain why the opinion is inconsistent with the objective data. (*See* Doc. 9-3 at 21) The ALJ did not identify the "self-reported abilities" that are inconsistent with Dr. Tran's findings, or the findings that were "within normal limits" that contradicted her opinion. (*See id.*) Furthermore, the ALJ fails to explain how the lack of a prescription for a cane contradicted Dr. Tran's opinion that Plaintiff did not need one around a house, but should have one "to ambulate in the community." (*See* Doc. 9-3 at 21; Doc. 9-8 at 51) Notably, Dr. Tran determined many parts of the examination were *not* within normal limits, including Plaintiff's range of motion in his hips, and "some abnormal sensation in the distal feet." (Doc. 9-8 at 49-50) In addition, Plaintiff's treating podiatrist told him on more than one occasion to "only ambulate for necessities" when Plaintiff was having difficulty with his feet (*see, e.g.,* Doc. 9-9 at 77, 79), which suggests Plaintiff *did* have difficulty with ambulation as Dr. Tran opined.

Because the ALJ failed to identify and explain inconsistencies between the record and the conclusions offered by Dr. Tran, the ALJ fails to meet his burden to resolve the conflict. *See Allen*, 749 F.2d at 579; *Embrey*, 849 F.2d at 421. Thus, the purported inconsistencies do not support the decision to give less weight to the limitations imposed by Dr. Tran.

2.   Opinion of Dr. Cabrera

Evaluating the medical evidence, the ALJ indicated he gave "little weight to Dr. Cabrera's medical opinion." (Doc. 9-3 at 21) The ALJ explained his reasons as follows:

> First, it is contrary to the claimant's working fulltime for two years during the period Dr. Cabrera assessed the claimant to have the above limitations. Second, the objective medical evidence does not corroborate his limitations. For example, there is no evidence of bilateral hand impairs (sic) that would justify manipulative limits. Third, it contradicts the claimant's reported abilities. For example, the claimant reports using a laptop computer without any difficulties. [Fourth], the farfetched nature of his

11

limitations undermines the credibility of his assessment as a whole.

(*Id.*) Plaintiff contends these reasons are legally insufficient to reject the opinion of his treating physician. (Doc. 12 at 12-14)

### a.  *Inconsistencies with Plaintiff's level of activity*

The Ninth Circuit has determined an ALJ may reject an opinion when the physician sets forth restrictions that "appear to be inconsistent with the level of activity that [the claimant] engaged in." *Rollins*, 261 F.3d 853, 856 (9th Cir. 2001); *see also Fisher v. Astrue*, 429 Fed. App'x 649, 652 (9th Cir. 2011) (concluding the ALJ set forth specific and legitimate reasons for rejecting a physician's opinion where the assessment was based upon the claimant's subjective complaints, and limitations identified by the doctor conflicted with the claimant's daily activities).

Notably, although the ALJ contends Dr. Cabrera indicated Plaintiff had these limitations while working, Plaintiff testified he stopped working because he was unable to do his job. (Doc. 9-3 at 51) Further, the ALJ fails to explain how Plaintiff's testimony that he uses a computer when he "get[s] a chance" contradicts the manipulative limitations identified by Dr. Cabrera. Contrary to the ALJ's assertion, Plaintiff did not testify that he uses he laptop "without any difficulties." (*See id.*) Indeed, there is no information regarding whether Plaintiff uses a touch-screen laptop, has difficulty typing, or whether he was typing when using the computer. Consequently, the ALJ fails to identify evidence in the record clearly demonstrating that Plaintiff's level of activity exceeds the limitations identified by Dr. Cabrera, and this factor does not support the ALJ's decision to reject the limitations.

### b.  *Inconsistencies with the record*

As noted above, an ALJ may reject limitations imposed by a physician that are inconsistent with the overall record. *Morgan*, 169 F.3d at 602-03. Here, the ALJ asserts the limitations imposed by Dr. Cabrera were "farfetched" and not corroborated by the objective medical evidence. (Doc. 9-3 at 21) According to the ALJ, there were not "hand impairments that would justify manipulative limits." (*Id.*) However, the ALJ fails to address Dr. Cabrera's belief that Plaintiff had diabetic neuropathy, and fails to identify any specific evidence in the record undermining the manipulative limitations identified by Dr. Cabrera. (*See* Doc. 9-10 at 58) Rather, the ALJ offered only his conclusion that the opinion was not consistent with the medical record, and erred in evaluating the limitations imposed. *See*

*Embrey,* 849 F.2d at 421-22

### 3. The ALJ's opinion lacks the support of substantial evidence

Defendant argues that the ALJ's decision is supported by substantial evidence, including the decisions of non-examining physicians Drs. Frankel and Bugg. (Doc. 15 at 4) According to Defendant, the opinions of Drs. Bugg and Frankel were "consistent with other evidence in the record; and therefore, constituted further substantial evidence that Plaintiff could perform light work." (*Id.*, citing *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995)).

Opinions of non-examining physicians may constitute substantial evidence in support of an ALJ's decision when "consistent with other independent evidence in the record." *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001). Here, the ALJ did not explain how the evidence set forth by Drs. Frankel and Bugg was consistent with other independent evidence in the medical record. (*See* Doc. 9-3 at 21) Moreover, the non-examining physicians did not have the benefit of reviewing the medical record showing deterioration in Plaintiff's condition, such as his diabetes becoming uncontrolled, indications that Plaintiff had diminished pedal pulses, and diabetic neuropathy.

Given the ALJ's failure to identify specific and legitimate reasons for rejecting the limitations imposed by Plaintiff's treating physician and the examining physician, and the failure to explain how the opinions of Drs. Frankel and Bugg were consistent with the record, the Court finds the ALJ's analysis of the medical record is not supported by substantial evidence.

## B. Remand is Appropriate

The decision whether to remand a matter pursuant to sentence four of 42 U.S.C. § 405(g) or to order immediate payment of benefits is within the discretion of the district court. *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000). Except in rare instances, when a court reverses an administrative agency determination, the proper course is to remand to the agency for additional investigation or explanation. *Moisa v. Barnhart*, 367 F.3d 882, 886 (9th Cir. 2004) (citing *INS v. Ventura*, 537 U.S. 12, 16 (2002)). Generally, an award of benefits is directed when:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996). In addition, an award of benefits is directed where no useful purpose would be served by further administrative proceedings, or where the record is fully developed. *Varney v. Sec'y of Health & Human Serv.*, 859 F.2d 1396, 1399 (9th Cir. 1988).

In this case, the ALJ failed to identify specific and legitimate reasons for giving rejecting the opinion of Drs. Cabrera and Tran related to Plaintiff's physical impairments. These opinions are intertwined with the residual functional capacity determination, which lacks the support of substantial evidence. Therefore, the matter should be remanded for the ALJ to re-evaluate the medical evidence to determine Plaintiff's physical residual functional capacity. *See Moisa* , 367 F.3d at 886.

## CONCLUSION AND ORDER

For the reasons set forth above, the Court finds the ALJ erred in his evaluation of the medical record, and the administrative decision should not be upheld by the Court. *See Sanchez*, 812 F.2d at 510. Accordingly, the Court **ORDERS**:

1. Pursuant to sentence four of 42 U.S.C. § 405(g), this matter is **REMANDED** for further proceedings consistent with this decision; and
2. The Clerk of Court **IS DIRECTED** to enter judgment in favor of Plaintiff Juan Chavez and against Defendant Nancy A. Berryhill, Acting Commissioner of Social Security.

IT IS SO ORDERED.

Dated: __March 3, 2017__     _____/s/ Jennifer L. Thurston__
                              UNITED STATES MAGISTRATE JUDGE